



FILED

OCT 16 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 11-19212-B-11 |
| Merced Falls Ranch, LLC, | ) | DC No. CN-1 |
| Debtor. | ) | |

**MEMORANDUM DECISION REGARDING SPECIAL COUNSEL'S
APPLICATION FOR PAYMENT OF CONTINGENCY FEE**

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Troy A. Thielemann, Esq., of Cappello & Noël LLP, appeared on behalf of special counsel Cappello & Noël LLP.

Riley C. Walter, Esq., of Walter & Wilhelm Law Group, appeared on behalf of the debtor Merced Falls Ranch, LLC.

Before the court is an application for payment of final fees and/or expenses (the "Application") filed by the law firm of Cappello & Noël LLP ("Cappello") for services rendered as special counsel to Merced Falls Ranch, LLC (the "Debtor"). Cappello seeks the award of a contingency fee in the amount of $554,650 (the "Contingency Fee") based on the terms of a prepetition fee agreement with the Debtor (the "Fee Agreement"). The Debtor disputes Cappello's interpretation of the Fee Agreement and asks that the Application be denied entirely. For the reasons set forth below, the Application will be granted.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this

1  contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). The court

2  has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 11 U.S.C. §§ 327 and

3  328,[1] and General Order Nos. 182 and 330 of the U.S. District Court for the Eastern

4  District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

5  **Background and Findings of Fact.**

6      **The Employment of Cappello.** The Debtor filed a voluntary petition under

7  chapter 11 on August 16, 2011, in order to stay a non-judicial foreclosure sale by its

8  secured creditor American AgCredit, ACA[2] ("AAC"). Based on the Debtor's schedules,

9  the Debtor had real property assets valued in excess of $339 million. AAC was trying to

10  enforce a loan, secured by those assets in the approximate amount of $11 million, which

11  had matured in December 2010 (the "AAC Loan"). The AAC Loan was guaranteed by

12  the Debtor's sole member, Stephen W. Sloan ("Sloan").

13      Prior to the bankruptcy, the Debtor, Sloan, and an affiliated entity, Sloan Cattle

14  Company, LLC, retained Cappello to prosecute an action in the state court for, *inter alia*,

15  damages against AAC based on claims of lender liability (the "State Court Action").[3]

16  The plaintiffs sought damages in the amount of $100 million. They also requested an

17  injunction to stop AAC's foreclosure sale; however, after having their request denied, the

18  Debtor filed this bankruptcy petition to invoke the automatic stay.

19      Soon after commencement of the case, the Debtor filed an application seeking to

20  employ Cappello as its "special counsel" in order to continue prosecuting the State Court

21  Action (the "Employment Application"). The Employment Application requested

22

23      [1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy
24  Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-
9036, as enacted and promulgated *after* October 17, 2005, the effective date of the Bankruptcy
25  Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, Apr. 20,
2005, 119 Stat. 23.
26

27      [2]The acronym "ACA" stands for Agricultural Credit Association.

28      [3]Merced County Superior Court (Case No. CV 001935).

authorization to compensate Cappello according to the terms of the Fee Agreement. The purpose for Cappello's employment was stated in the Employment Application as follows:

> Given that there will be inevitable overlap between the [State Court Action] and this bankruptcy case, the Debtor has determined that it would be more efficient and productive for Cappello & Noel to be hired to assist in providing counsel to the Debtor with respect to the [State Court Action] and all litigation matters involving American AgCredit in the case. . . .

Nothing in the Employment Application contemplated or suggested that Cappello would advise or assist the Debtor in the performance of its duties in chapter 11 or participate in the negotiation of a chapter 11 plan. Indeed, the Employment Application confirmed that the scope of Cappello's employment would be limited: "The Debtor believes that the services to be provided by [Cappello] to the Debtor will not overlap or be duplicative of the services being provided to the Debtor by any other counsel." The Employment Application was approved on October 20, 2011. Cappello was employed on the terms "as requested in the Employment Application" pursuant to the provisions of §§ 327(e) and 328(a). However, Cappello's compensation was left subject to court review and approval.

**The Contingency Fee Agreement.** As part of the Employment Application, the Debtor attached the pre-petition Fee Agreement under which the Debtor had initially engaged Cappello. The Fee Agreement provided for a hybrid fee arrangement whereby Cappello was entitled to recover both hourly fees for services rendered (paragraph 3.2 of the Fee Agreement), plus a Contingency Fee dependent on future events. For purposes of this contested matter, the critical portion of the Fee Agreement is paragraph 3.4 which provided in pertinent part:[4]

/ / /

---

[4] A handwritten addendum to paragraph 3.4 was added at the end of the Fee Agreement. It purports to exclude from paragraph 3.4, and the calculation of a contingency fee, any new funding from sources arranged by Sloan prior to the effective date of the Fee Agreement. Neither of the parties have addressed this addendum and it appears to be inapplicable here.

3

1          3.4    DEBT REDUCTION - LOAN WORKOUT AGREEMENT.
In addition to the hourly fees set forth above, Clients shall pay Cappello &

2    Noël the sum equal to seven percent (7%) of any debt relief, debt reduction
or cancellation of any alleged indebtedness to American AgCredit, ACA,

3    including debt reduction resulting from the transfer of Clients' real or
personal property to American AgCredit, ACA, or to any entities or third

4    persons. *In the event any existing financing Clients have with American
AgCredit, ACA is extended or modified, or in the event Clients obtains*

5    *[sic] new financing from American AgCredit, ACA, or any other source
developed for Clients by Cappello & Noël, then Clients shall pay Cappello*

6    *& Noël the sum equal to five percent (5%) of the amount of any new,
modified, or restructured financing Clients obtain.* If due to the efforts of

7    Cappello & Noël Clients have the time to obtain financing from another
source, Cappello & Noël shall be entitled to five percent (5%) of the

8    amount of any such new financing.

9    Sums owing to Cappello & Noël pursuant to this paragraph shall be due
and payable upon execution of the documents which accomplish such debt

10    reduction, extension, modification, and new financing. Any sums not paid
within thirty (30) days shall accrue interest in accordance with paragraph

11    4.1. The above percentages shall be payable even if Cappello & Noël is
discharged or withdraws prior to the occurrence of any debt relief or loan

12    workout. (Emphasis added.)

13          In November 2011, Cappello filed an application for payment of interim fees in

14    the amount of $88,245, based on the hourly rates for actual services rendered through

15    October 2011 (the "Interim Fee Application"). The Interim Fee Application was not

16    contested, it was approved, and the interim fees have been paid. It appears from the

17    record that Cappello did not perform any additional work with regard to the State Court

18    Action after October 28, 2011. Based on the timing of the Interim Fee Application in

19    relation to the cessation of work on the State Court Action, and the fact that the Debtor

20    subsequently negotiated a consensual chapter 11 plan which provides for dismissal of the

21    State Court Action (see discussion below), the court infers that Cappello's work in the

22    State Court Action was suspended at the Debtor's request after settlement negotiations

23    with AAC began.

24          **The Chapter 11 Plan.** The Debtor and AAC filed a "joint" chapter 11 plan of

25    reorganization on April 6, 2012 (the "Plan"), which was confirmed without opposition on

26    June 18, 2012. The Plan was a consensual plan, the product of negotiations exclusively

27    between the Debtor, the Debtor's bankruptcy counsel, Sloan's business counsel, and

28    AAC's counsel. Cappello was not directly involved in the settlement negotiations,

4

however, Cappello was apparently apprised of the ultimate agreement embodied in the Plan.[5]

As a result of their negotiations, the Debtor and AAC agreed to resolve their claims and disputes against one another. Through the Plan, AAC agreed to fix the interest rate on its claim and to establish a schedule of benchmark dates for the liquidation of collateral and payment of its claim. AAC's secured claim was described in the Plan as "impaired." Other terms agreed to by the parties were set forth in a document referred to as the "Confidential Letter," an unfiled written agreement between the Debtor and AAC which was incorporated by reference in the Plan.[6] Specifically with regard to the payment of AAC's Loan, the Confidential Letter established a new deadline for partial (50%) payment and an option to extend the time for full payment.

> The Deadline Date shall be December 26, 2012; provided that the Debtor shall have option to extend the Deadline Date to June 26, 2013 (the "Extension Option"), provided that each of the following conditions has been met: (a) the Debtor shall have delivered written notice (the "Extension Notice") to AAC no later than September 30, 2012 that the Debtor has elected to extend the Deadline Date, (b) at the time of delivery of the Extension Notice, the Debtor shall have made payments to AAC after the Effective Date that equal or exceed 50% of the AAC Claim Amount, and (c) at the time of the delivery of the Extension Notice, the Termination Date shall not have occurred.

In addition to resolving any dispute over the AAC Loan, the Plan also provided at paragraph 6.1 for waiver of the Debtor's claims against AAC and dismissal of the State Court Action.

**Cappello's Fee Application.** On July 18, 2012, Cappello filed this Fee Application requesting payment of a Contingency Fee in the amount of $554,650 (5% of the original AAC Loan in the amount of $11,093,000). Cappello contended that it was entitled to the Contingency Fee because the first condition precedent in paragraph 3.4 of

---

[5] The Debtor alleges that at one point Cappello advised against acceptance of AAC's settlement proposal for reasons that are undisclosed.

[6] Though the Confidential Letter was intended to remain confidential between the Debtor and AAC, after oral argument, the court ordered the Debtor to file the Letter for consideration in this matter.

the Fee Agreement had been satisfied in the confirmed Plan, that the Debtor's existing

financing with AAC had been "extended or modified."

The Debtor opposed the Fee Application, arguing for a different interpretation of

the Fee Agreement. Looking solely to the third condition in paragraph 3.4, the Debtor

contends that the ultimate settlement with AAC was not "developed by Cappello" (the

"Opposition").[7]  Since Cappello did not directly participate in the settlement

negotiations, Debtor suggested that Cappello was not entitled to the Contingency Fee. In

its initial Opposition brief, the Debtor ostensibly conceded that the AAC Loan had been

"extended or modified," when it presented the "developed by Cappello" argument:

> The *extension and modification of financing from AAC* to the Debtor are the exclusive product of negotiations involving the Debtor, Mr. Sawyers, Mr. Rogers, and bankruptcy counsel . . . . Special Counsel did not produce the *extension and modification of financing from AAC* to the Debtor, nor did its work with regard to the State Court Action have any impact on the Joint Plan. (Emphasis added.)

In its reply brief, Cappello noted the effect of the Debtor's "extension and

modification" statements and argued that the Debtor was focusing on the wrong

condition precedent, or triggering event in the Fee Agreement. At the hearing on the Fee

Application, the Debtor essentially abandoned the "developed by Cappello" argument

and presented a new argument, that the Plan's treatment of the AAC Loan did not

constitute an "extension or modification" of the Loan. Because the Debtor raised this

argument for the first time at the hearing, the court issued an order directing the Debtor

to file a copy of the Confidential Letter and allowed the Debtor to file "any supplemental

opposition brief the Debtor wishes the court to consider with regard to the 'extension or

modification' issue raised at the hearing."

The Debtor did file a supplemental brief with a copy of the Confidential Letter,

---

[7]Neither Sloan nor Sloan Cattle Company, LLC, officially joined in the Opposition. However, Sloan is the Debtor's managing member and owns 100% of the equity interest in the Debtor. He actually participated in the Opposition and submitted two declarations in support of the Opposition.

but it declined to further pursue the "extension or modification" argument raised at the hearing. Instead, the Debtor retreated back to its original "developed by Cappello" argument. Indeed, in its supplement brief, the Debtor again seemed to concede that the confirmed Plan constituted both an "extension and modification" of the AAC Loan.[8]

**Issue Presented.**

There are in this contested matter no material issues of disputed fact and neither party has requested an evidentiary hearing. The question before the court, Cappello's right to receive the Contingency Fee, is a function of contract interpretation. Cappello contends that the Contingency Fee was earned upon the "extension or modification" of the AAC Loan without regard to Cappello's participation in the settlement negotiations that led to confirmation of the Plan. The Debtor counters that all of the conditions for payment of the Contingency Fee, including the "extension or modification" condition, were qualified by the "produced by Cappello" clause in paragraph 3.4 of the Fee Agreement.[9]

**Analysis and Conclusions of Law.**

**The Employment and Compensation of Special Counsel Under §§ 327(e) and 328(a).** Cappello was employed to work for the Debtor in the capacity of "special counsel" pursuant to § 327(e) of the Bankruptcy Code. As a matter of law, Cappello's

---

[8]In paragraph 14 of the supplemental brief, the Debtor repeated the statement made in its initial Opposition brief:

> The *extension and modification of financing from AAC* to the Debtor are the exclusive product of negotiations involving the Debtor, Mr. Sawyers, Mr. Rogers, and bankruptcy counsel. . . . Special Counsel did not produce the *extension and modification* of financing from AAC to the Debtor, nor did its work with regard to the State Court Action have any impact on the Joint Plan. (Emphasis added.)

[9]Because the Debtor declined to address the "modification or extension" issue in its supplemental opposition brief as ordered by the court, the Debtor has apparently waived that issue and has conceded that the AAC Loan was both "extended and modified" by the Plan. The court therefore has no need to determine whether the Plan's treatment of AAC's Loan constitutes a "modification or extension" for purposes of this decision.

employment was limited to a "specified special purpose" which had to be unrelated to "conducting the bankruptcy" case itself.[10]  At the same time, the Debtor asked that Cappello's compensation package be approved under § 328(a) which provides for the compensation of a professional person pursuant to negotiated terms.[11]  Once § 328(a) is invoked, the bankruptcy court has limited discretion to vary the contractual terms of that employment.

> Where the bankruptcy court has previously approved the terms for compensation of a professional, when the professional ultimately applies for payment, the court cannot alter those terms unless it finds the original terms "to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

*Pitrat v. Reimers (In re Reimers)*, 972 F.2d 1127, 1128 (9th Cir. 1992) (quoting § 328(a)); *see also In re Confections by Sandra, Inc.*, 84 B.R. 729, 731 (9th Cir. BAP 1987).  When no such unforeseen circumstances exist to warrant adjustment of fees, "§ 328(a) limits the authority of the bankruptcy court to depart from the terms of the fee agreement previously approved." *In re First Magnus Fin. Corp.*, No.

---

[10] Section 327(e) allows the employment of "special counsel" for a "limited" purpose:

(e)  The trustee, with the court's approval, may employ, *for a specified special purpose, other than to represent the trustee in conducting the case*, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.  (Emphasis added.)

[11] Section 328(a) provides:

(a)  The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, *on an hourly basis*, on a fixed or percentage fee basis, or on a *contingent fee basis*. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.  (Emphasis added.)

8

AZ-08-1160-PaDMo, 2009 WL 7809001, at *8 (9th Cir. BAP Feb. 24, 2009). Thus, once the court has already unconditionally approved the professional's employment under § 328, "[t]here is no question that [it] may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate." *In re B.U.M Int'l, Inc.*, 229 F.3d 824, 829 (9th Cir. 2000).

Here, the Debtor acknowledges that Cappello was properly employed pursuant to the terms of the Fee Agreement and is not asking the court to alter the terms and conditions for Cappello's employment.[12] The Debtor does not contend that Cappello's employment was "improvident." Rather, the Debtor requests only that the court interpret the Fee Agreement in such a manner that Cappello is not entitled to the Contingency Fee.

**Contract Interpretation Under California Law.** This dispute between the Debtor and Cappello turns on the interpretation of the Fee Agreement, specifically the contingency fee provision in paragraph 3.4. The Debtor argues that the Fee Agreement only provides for the Contingency Fee if the settlement with AAC had been "developed by Cappello." Since the Debtor's bankruptcy counsel and others worked with AAC to negotiate and confirm the consensual Plan, the Debtor contends that none of the "triggering events" for a Contingency Fee ever occurred. Cappello counters that Fee Agreement does not require Cappello's participation in the settlement negotiations with

---

[12] In addition to the existence of unforeseen circumstances, the court may also adjust a fee award where the court has not unconditionally approved the terms of an employment application. In *In re B.U.M. Int'l, Inc.*, the Ninth Circuit reasoned that the bankruptcy court had not unconditionally approved the terms of an employment application under § 328 where the court's written order contained an additional proviso that "all fees and costs of [the professional] are subject to Court approval." 229 F.3d at 830. Because the fees were still subject to court approval, the court had intended to reserve its authority to conduct a "reasonableness and benefit to the estate" review under § 330. *Id.* In contrast, the facts in this case show that no such authority was reserved by this court. Though similar, the court's order approving Cappello's employment contained an additional qualifier, stating "*pursuant to the provisions of Section 328, the award of fees and expenses is subject to court review and approval.*" Order Approval Employment of Cappello & Noël LLP as Special Litigation Counsel at 2 (ECF No. 48) (emphasis added). Because the court explicitly referenced § 328 in the order, review of the fees is only proper under the § 328 standard, rather than the one under § 330.

9

1    AAC, only that an "extension or modification" of the AAC Loan actually occurred.

2           In interpreting and construing the Fee Agreement, the court must turn to the rules

3    of contract interpretation under state law. *See Commercial Paper Holders v. Hine (In re*

4    *Beverly Hills Bancorp)*, 649 F.2d 1329, 1332-33 (9th Cir. 1981) (interpreting settlement

5    agreement approved by bankruptcy court's order). In this case, the court must look to

6    applicable California law for guidance.[13] To properly interpret the Fee Agreement, "All

7    the rules of interpretation must be considered and each given its proper weight, where

8    necessary, in order to arrive at the true effect of the instrument." *City of Manhattan*

9    *Beach v. Superior Court*, 13 Cal. 4th 232, 238 (1996).

10          Under California law, the fundamental goal of contract interpretation is to give

11   effect to the mutual intention of the parties as it existed at the time of contracting. Cal.

12   Civ. Code § 1636; *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857,

13   868 (1998). "When a contract is reduced to writing, the intention of the parties is to be

14   ascertained from the writing alone, if possible." Cal. Civ. Code § 1639. "The language

15   of a contract is to govern its interpretation, if the language is clear and explicit, and does

16   not involve an absurdity." Cal. Civ. Code § 1638. In interpreting a contract, the "whole

17   of a contract is to be taken together so as to give effect to every part, if reasonably

18   practicable, each clause helping to interpret the other," Cal. Civ. Code § 1641, so as to

19   avoid finding ambiguity in the abstract. *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109,

20   1118 (1999).

21          A contractual provision is ambiguous when it is capable of two or more

22

23

24          [13] In a bankruptcy case, the court must apply federal choice of law rules. *See Lindsay v.*
     *Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir.1995). Federal choice of
25   law rules follow the approach of the Restatement (Second) of Conflict of Laws. *See Chuidian v.*
     *Philippine Nat'l Bank*, 976 F.2d 561, 564 (9th Cir.1992). Because the Retainer Agreement does
26   not contain a choice of law provision, the applicable rule is Restatement (Second) of Conflict of
     Laws § 188, which sets forth the "most significant relationship" approach. Here, the Debtor is a
27   California limited liability company, Cappello is a firm comprised of California licensed
     attorneys, and the transaction occurred in California. Therefore, California law applies.
28

10

interpretations, both of which are reasonable. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993). If ambiguity exists, "it is resolved by interpreting the ambiguous provisions in the sense the promisor . . . believed the promisee understood them at the time of formation." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (citing Cal. Civ. Code § 1649). "If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist," namely the drafter of the contract. *Id.* (citing Cal. Civ. Code § 1654). However, the court will not adopt a strained or absurd interpretation of a contract in order to create an ambiguity where none exists. *Magna Enters, Inc. v. Fid. Nat'l Title Ins. Co.*, 104 Cal. App. 4th 122, 126 (2002).

In the particular context of a retainer agreement between an attorney and his client, the court must typically construe such agreement, including any provision for attorney's fees, under the ordinary rules of contract interpretation. *See* Cal. Civ. Code § 1635. However, in addition to the ordinary rules, "[a] primary rule . . . is that attorney fee contracts must be fair and reasonable, and such contracts are strictly construed against the attorney." *In re Cnty. of Orange*, 241 B.R. 212, 221 (C.D. Cal. 1999) (citing *Alderman v. Hamilton*, 205 Cal. App. 3d 1033, 1037 (1988)). With these basic rules and principles, the court now turns to paragraph 3.4 of the Fee Agreement, the contractual provision at issue, to determine its meaning.[14]

**The Last Antecedent Rule.** Under paragraph 3.4 of the Fee Agreement, there are three independent conditions precedent to an award of the Contingency Fee: (1) if the Debtor obtains an extension or modification of existing financing with AAC; (2) if the Debtor obtains new financing with AAC; or (3) if the Debtor obtains new financing from another source. Since all three conditions are connected with the term "or," any one of

---

[14] The Retainer Agreement appears to meet all of the requirements in California Business & Professions Code § 6147, the applicable statute governing contingency fee agreements between attorneys and clients. Thus, the court's review is strictly limited to the issue of contract interpretation.

11

1   these conditions, once satisfied, would serve as the "triggering event" for an award of the
2   Contingency Fee. The precise issue here is whether each of these stated conditions is
3   also subject to the qualifying phrase "developed for Clients by Cappello & Noël" which
4   follows the third "new financing from any other source"condition.

5           Cappello essentially argues for application of the "last antecedent rule." Though
6   ordinarily applied to questions of statutory construction, the California courts have stated
7   that the "last antecedent rule" is also applicable in contract cases. *ACS Sys., Inc. v. St.*
8   *Paul Fire & Marine Ins. Co.*, 147 Cal. App. 4th 137, 150 (2007); *People ex rel. Lockyer*
9   *v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 529 (2003). The rule provides that
10  "qualifying words, phrases and clauses are to be applied to the word or phrases
11  immediately preceding and are not to be construed as extending to or including others
12  more remote." *Renee J. v. Superior Court*, 26 Cal. 4th 735, 743 (2001) (internal
13  quotation marks omitted) (citing *White v. Cnty. of Sacramento*, 31 Cal. 3d 676, 680
14  (1982)). Applied here, the rule would require that the phrase "developed for Clients by
15  Cappello & Noël" be read to qualify only the last condition to which the phrase is
16  attached, the condition that the Debtor has obtained new financing from "any source"
17  other than AAC. The "extension or modification" and "developed by Cappello" clauses
18  are separated by sixteen words, including two "or"s and two commas. By a plain reading
19  of the Fee Agreement, the "developed by Cappello" qualification does not appear to
20  modify the first "extension or modification" condition. Cappello would be entitled to the
21  Contingency Fee so long as there was an extension or modification of the Debtor's
22  existing financing with AAC, regardless of whether such result was "developed for [the
23  Debtor] by [Cappello]."

24          "However, the last antecedent rule is 'not immutable' and should not be 'rigidly
25  applied' in all cases." *Lockyer*, 107 Cal. App. 4th at 530 (quoting *In re Phelps*, 93 Cal.
26  App. 4th 451, 456 (2001)); *accord Anderson v. State Farm Mut. Auto. Ins. Co.*, 270 Cal.
27  App. 2d 346, 349 (1969) ("A limiting clause is to be confined to the last antecedent,
28  *unless the context or evident meaning requires a different construction.*" (emphasis

1  added) (citing *Elbert, Ltd. v. Gross*, 41 Cal. 2d 322, 326-27 (1953)). California law has

2  recognized exceptions to the last antecedent rule. "One [exception] provides that when

3  several words are followed by a clause that applies as much to the first and other words

4  as to the last, 'the natural construction of the language demands that the clause be read as

5  applicable to all.'" *Renee J.*, 26 Cal. 4th at 743 (quoting *Wholesale Tobacco Dealers*

6  *Bureau of S. Cal. v. Nat'l Candy & Tobacco Co.*, 11 Cal. 2d 634, 659 (1938)).

7  Additionally, "the rule of the last antecedent is merely an aid to construction, applicable

8  only where there exist uncertainties and ambiguities. This merely means, however, that if

9  the clear intent of the parties is opposed to the application of the rule, the rule must

10  yield." *Anderson*, 270 Cal. App. 2d at 349-50 (citations omitted).

11       Turning again to paragraph 3.4, the court is persuaded that the last antecedent rule

12  applies in this case, that the Fee Agreement is not uncertain and ambiguous, and that

13  Debtor's interpretation of the Fee Agreement is both strained and unreasonable. Upon

14  review of paragraph 3.4, the court can identify several factors to explain why the

15  "developed by Cappello" term was not intended to modify the "extension or

16  modification" clause.[15]

17       To begin, the qualifying "developed by Cappello" term was not separated from

18  the "any source" term by a comma. *See Bd. of Trs. v. Judge*, 50 Cal. App. 3d 920, 927

19  (1975) ("[The] presence or absence [of commas] . . . is a factor to be considered in its

20  interpretation."). "Evidence that a qualifying phrase is supposed to apply to all

21  antecedents instead of only to the immediately preceding one may be found in the fact

22  that it is separated from the antecedents by a comma." *White*, 31 Cal. 3d at 680 (citing

23  Bd. of Trs., 50 Cal. App. 3d at 927 n.4). Here, no comma was placed before the phrase

24  "developed for Clients by Cappello & Noël." Instead, the qualifying phrase continued as

25  part of the immediately preceding clause "any other source." Further, the resulting

___

27  [15]Notably absent from the Debtor's Opposition is any argument or evidence to suggest
28  that the Debtor actually intended the Fee Agreement to mean what it now urges on the court.

1 clause which reads "any other source developed for Clients by Cappello & Noël" was set
2 off from the preceding clauses by a comma and the conjunction "or," which strongly
3 suggests that "[s]uch use of the word 'or' in a [contract] indicates an intention to use it
4 disjunctively so as to designate alternative or separate categories." *Id.* (citations
5 omitted). The construction of the sentence supports a conclusion that the qualifying
6 phrase was intended only to modify the third "new financing from any other source"
7 condition precedent.

8      Next, even if the court were to disregard the absence of a comma before the
9 qualifying phrase "developed for Clients by Cappello & Noël," that clause does not
10 follow a series or list of consistent antecedent clauses. "The exemplary application of
11 the last antecedent rule is a case where a modifying phrase appears after a list of multiple
12 items or phrases." *Lockyer*, 107 Cal. App. 4th at 530; *see, e.g., White*, 31 Cal. 3d at 679
13 (involving modifying phrase "for purposes of punishment" followed a list of consistent
14 antecedents "dismissal, demotion, suspension, reduction in salary, written reprimand, or
15 transfer" in noun form). Because of the structural inconsistencies between the
16 antecedent clauses, the qualifying phrase cannot logically have been intended to apply to
17 the "extension or modification" clause.

18      For a modifying phrase to apply to all antecedent clauses in a series, the series
19 must be written in a way where the modifying phrase can logically attach to the end of
20 each clause within that series. Here, the presence of two introductory "in the event"
21 phrases creates two independent and separate sets of clauses. The first "extension or
22 modification" clause follows the first "in the event" term while the qualifying
23 "developed by Cappello" clause follows the second "in the event" term. Therefore, the
24 qualifying phrase can, at best, apply only to the second and third triggering conditions
25 which appear in the second set.[16]

26

27      [16] Because the facts of this case do not involve the second condition precedent relating to
28 the Debtor obtaining new financing with AAC, the court has no reason to decide whether the

14

**The "Absurd Result" Limitation.** Even if the language of a contract is unambiguous, the interpretation of a contract "must be fair and reasonable, not leading to absurd conclusion." *Transamerica Ins. Co. v. Sayble*, 193 Cal. App. 3d 1562, 1566 (1987); *accord* Cal. Civ. Code § 1638. "The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." *Strong v. Theis*, 187 Cal. App. 3d 913, 920 (1986); *see also* Cal. Civ. Code § 1643. Though the Debtor did not affirmatively make this argument, the Debtor contends that the award of a Contingency Fee to Cappello would result in an "inequitable windfall." Hence, the court has considered whether Cappello's interpretation of the Fee Agreement leads to an absurd or inequitable result.

Addressing first the "inequitable windfall" argument, the court notes that Cappello was initially engaged, prior to the bankruptcy, expressly to prosecute the State Court Action in an effort to save assets which the Debtor valued in excess of $300 million. The Contingency Fee which Cappello seeks amounts to approximately 1/6 of one percent of the assets that were ultimately rescued through the Plan. In relative terms, Cappello's Contingency Fee is hardly an "inequitable windfall."

Turning now to the "absurd result" argument, the court notes that the Fee Agreement contemplates the award of a contingency fee in several situations where Cappello would not have necessarily "developed" the ultimate settlement with AAC. In that regard, Cappello's interpretation of the "extension or modification" clause is not inconsistent with the rest of the document. For example, the first sentence of paragraph 3.4 entitles Cappello to a 7% contingency fee, in addition to the hourly fee, if the Debtor obtained from AAC any kind of debt relief, reduction, or cancellation, without regard to whether Cappello directly produced that result:

/ / /

/ / /

---

"developed by Cappello" phrase qualifies to that condition.

In addition to the hourly fees set forth above, Clients shall pay Cappello & Noël the sum equal to seven percent (7%) of *any debt relief, debt reduction or cancellation* of any alleged indebtedness to American AgCredit, ACA, including debt reduction resulting from the transfer of Clients' real or personal property to American AgCredit, ACA, or to any entities or third persons. (Emphasis added.)

After the three conditions in paragraph 3.4, the Fee Agreement reads, "If due to the efforts of Cappello & Noël *Clients have the time to obtain financing* from another source, Cappello & Noël shall be entitled to five percent (5%) of the amount of any such new financing." Nothing in this sentence contemplates that Cappello must actually develop the "new financing," only that Cappello's efforts give the Debtor sufficient "time to obtain new financing."

Further down in paragraph 3.4, it states, "The above percentages shall be payable *even if Cappello & Noël is discharged or withdraws prior* to the occurrence of any debt relief or loan workout." (Emphasis added.) Again, nothing in this sentence contemplates that Cappello must actually "develop" and consummate the ultimate result. In all three of these situations, Cappello would still be entitled to a Contingency Fee without regard to Cappello's direct involvement in the "new financing" or "loan workout" process.

**Interpretation of the Fee Agreement in Light of Applicable Bankruptcy Law.** The Debtor belabors the fact that Cappello was not directly involved in the negotiations that ultimately led to confirmation of the Plan and dismissal of the State Court Action. However, the record reveals that Cappello was not employed for that purpose. As stated in the Employment Application, Cappello was employed to "to assist in providing counsel to the Debtor with respect to the [State Court Action] and *all litigation matters* involving American AgCredit in the case." (Emphasis added.) Nothing in the Employment Application suggests that Cappello would participate in negotiation of the Plan.

Further, in its capacity as "special counsel" employed under § 327(e), it would have been highly improper for Cappello to play a significant roll in negotiating the Plan. Pursuant to § 327(e), a professional may only be employed as special counsel "for a specified special purpose, *other than to represent [the debtor in possession] in*

16

*conducting the case*." (Emphases added.)  "The special purpose must be unrelated to the debtor's reorganization and must be explicitly defined or described in the application seeking approval of the attorney's employment." *In re Running Horse, L.L.C.*, 371 B.R. 446, 451 (Bankr. E.D. Cal. 2007) (citation omitted) (internal quotation marks omitted). If Cappello had actually been retained to negotiate a settlement and consensual Plan with AAC, while at the same time pressing the State Court Action as a backdrop to those negotiations, then the questions remain, why was that purpose not disclosed in the Employment Application, and why was Cappello obviously excluded from the Plan negotiations?

**Conclusion.**

Based on the foregoing, the court is persuaded that Cappello's interpretation of the Fee Agreement is consistent with the established rules for contract interpretation and applicable bankruptcy law.  The Fee Agreement is not ambiguous or uncertain and Cappello's interpretation does not lead to an absurd or inequitable result.  The Debtor agreed to pay Cappello a Contingency Fee if the Debtor was, *inter alia*, successful in its efforts to obtain an "extension or modification" of the AAC Loan.  Cappello prosecuted the State Court Action it was engaged to prosecute until the Debtor successfully negotiated a chapter 11 plan which both extended and modified the terms of the AAC Loan.  Accordingly, Cappello is entitled under the Fee Agreement to recover a 5% contingency fee for its services.  The Application will be granted.  Cappello shall submit an appropriate order.

Dated: October ___/6___, 2012

W. Richard Lee
United States Bankruptcy Judge

17